IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No.: 25-cv-01346

**DARREN O'CONNOR,**

      **Plaintiff,**

**v.**

**CITY OF BOULDER, a municipal corporation;**
**STEPHEN REDFEARN, Boulder Chief of Police, in his individual and official capacities,**
**NURIA RIVERA-VANDERMYDE, Boulder City Manager, in her individual and official capacities.**
      **Defendants.**

---

## FIRST AMENDED COMPLAINT

---

Darren O'Connor, by and through his attorney Joseph A. Salazar of Salazar Law, LLC, hereby files this First Amended Complaint against the City of Boulder, Stephen Redfearn, and Nuria Rivera-Vandermyde. In support thereof, Plaintiff states the following:

### I.      INTRODUCTION

1.      Plaintiff brings state and federal claims against Stephen Redfearn for violating Plaintiff's constitutional right to be free from retaliation for exercising his freedom of speech, freedom of association, and for engaging in a conspiracy to violate Plaintiff's constitutional rights under the Colorado Constitution and the United States Constitution.

2.      Plaintiff also brings federal claims against Nuria Rivera-Vandermyde for violating Plaintiff's constitutional right to be free from retaliation for exercising his freedom of speech, freedom of association, and for engaging in a conspiracy to violate Plaintiff's constitutional rights under the United States Constitution.

3.      Plaintiff further brings a federal claim against the City of Boulder for its failure to train or its inadequate training of employees regarding the constitutional rights of private individuals guaranteed under the Colorado Constitution and United States Constitution, which prohibit public officials from retaliating or conspiring against private individuals engaged in the right of freedom of speech and freedom of association.

## II.      PARTIES

4.      Darren O'Connor ("Plaintiff") is a citizen of the United States of America, a resident of the state of Colorado and County of Boulder. He is an attorney duly licensed in the state of Colorado. At all times relevant, Plaintiff was a member of the Boulder Chapter of the National Association for the Advancement of Colored People ("NAACP"). Plaintiff, as a private citizen, engaged in constitutionally protected speech against the City of Boulder and Stephen Redfearn.

5.      City of Boulder ("Defendant Boulder") is a Colorado municipal corporation. Defendant Boulder is responsible for the oversight, training, and supervision of all of its police officers, including the Chief of Police, and its employees, including the City Manager. Defendant Boulder failed to properly train Stephen Redfearn involving the constitutional rights of private individuals engaged in the freedom of speech and freedom of association under the United States and Colorado Constitutions. Defendant Boulder further failed to properly train Nuria Rivera-Vandermyde involving the constitutional rights of private individuals engaged in the freedom of speech and freedom of association under the United States Constitution. Defendant Boulder was at all relevant times the employer of Stephen Redfearn and Nuria Rivera-Vandermyde and is a proper entity to be sued under 42 U.S.C. § 1983.

2

6.      At all times relevant to this Complaint, Stephen Redfearn ("Defendant Redfearn") was a peace officer, as defined in § 24-31-901(3), C.R.S. (2024), a citizen of the United States of America, and resident of the state of Colorado. At all times relevant, Defendant Redfearn is a "person," as that term is defined under 42 U.S.C. § 1983 and is a proper person to be sued under 42 U.S.C. § 1983. Defendant Redfearn violated Plaintiff's right to be free from retaliation for exercising his freedom of speech and freedom of association in violation of the United States and Colorado Constitutions as enforced through federal and state law. Defendant Redfearn further engaged in a conspiracy with Nuria Rivera-Vandermyde to retaliate against Plaintiff for the exercise of his right to free speech and freedom of association in violation of the United States Constitution as enforced through 42 U.S.C. § 1983 and under Colorado law as enforced under § 13-21-131, C.R.S. Defendant Redfearn is a proper person to be sued under § 13-21-131, C.R.S.

7.      Nuria Rivera-Vandermyde ("Defendant Rivera-Vandermyde") is a resident of the state of Colorado. At all times relevant, she was the City Manager of Defendant Boulder. Defendant Rivera-Vandermyde is a "person," as that term is defined under 42 U.S.C. § 1983 and is a proper person to be sued under 42 U.S.C. § 1983. Defendant Rivera-Vandermyde violated Plaintiff's right to be free from retaliation for exercising his freedom of speech and freedom of association in violation of the United States Constitution as enforced through 42 U.S.C. § 1983. She further engaged in a conspiracy with Defendant Redfearn to retaliate against Plaintiff for the exercise of his right to free speech and freedom of association in violation of the United States Constitution as enforced through 42 U.S.C. § 1983.

### III.    JURISDICTION AND VENUE

8.      This action arises under the Constitution and laws of the United States, and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court over the claims against Defendants Boulder, Rivera-Vandermyde, and Redfearn pursuant to 28 U.S.C. § 1331 and § 1343(a)(3). Jurisdiction supporting Plaintiff's claims for attorney fees against Defendant Boulder is conferred by and brought pursuant to 42 U.S.C. § 1988.

9.      The state claims against Defendant Redfearn arise under article II of the Colorado Constitution as enforced through § 13-21-131, C.R.S. The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a) as the violations of federal law alleged are substantial and the pendent state law causes of action derive from a common nucleus of operative facts.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events or omissions giving rise to the claims alleged herein occurred in the State of Colorado, County of Boulder.

## IV.     STATEMENT OF FACTS

### Acts, Conduct, and Lawsuits Involving Defendant Redfearn

11.     Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

12.     Defendant Redfearn is no stranger to having his acts and conduct questioned as part of federal civil rights lawsuits or having his testimony questioned during criminal trials.

13.     For example, during the Elijah McClain criminal trial, Defendant Redfearn testified that he was the night shift duty captain for the Aurora Police Department on the night Mr. McClain was killed.

4

14.    While on the witness stand, Defendant Redfearn admitted that without conducting any investigation into the events that led to Mr. McClain's death, he changed the incident call logs from "suspicious person" to an "assault on an officer" simply based on the word of police officers who were involved in the death of Mr. McClain.

15.    Cataloguing a "suspicious person" in the incident call logs does not necessarily result in justification to stop or arrest the individual based on probable cause or even reasonable suspicion.

16.    However, changing the incident call logs from "suspicious person" to an "assault on an officer" is "magic language" implicating probable cause to justify police conduct related to an arrest.

17.    Defendant Redfearn testified that changing incident call logs without investigation was standard operating procedure.

18.    On February 22, 2021, the City of Aurora released an investigative report ("Aurora Report") wherein it was clearly stated that there was no probable cause to arrest Mr. McClain.

19.    In fact, the Aurora Report stated:

> In interviews with the Aurora Police Department's Major Crime/Homicide Unit ("Major Crime") investigators, none of the officers articulated a crime that they thought Mr. McClain had committed, was committing, or was about to commit. They provided the following reasons, none of which under the prevailing case law is sufficient to establish reasonable suspicion: Mr. McClain was acting "suspicious," was wearing a mask and waving his arms, and he was in an area with a "high crime rate."

20.    Thus, in relation to his testimony on the stand, Defendant Redfearn's intentional decision to change the incident call logs without investigation appeared to be made to cover the actions of those police officers who were violating the constitutional rights of Mr. McClain.

21.    The Aurora Report noted concerns with the after-incident investigation conducted by the Aurora Police Department:

> *The Aurora Police Department's Major Crime/Homicide Unit investigation of the death of Mr. McClain raised serious concerns for the Panel and revealed significant weaknesses in the Department's accountability systems. First, the interviews conducted by Major Crime investigators failed to ask basic, critical questions about the justification for the use of force necessary for any prosecutor to make a determination about whether the use of force was legally justified. Instead, the questions frequently appeared designed to elicit specific exonerating "magic language" found in court rulings.*

22.    Prior to his testimony during the criminal trial, Defendant Redfearn made no attempts to notify the public of his role in changing the incident call logs on the night Mr. McClain was murdered.

23.    It was only during his testimony on the stand that his actions came to light for public view and scrutiny.

24.    In addition to the Aurora Report, out of Mr. McClain's death came an investigation by the Colorado Attorney General's office to review the Aurora Police Department law enforcement practices – the investigation covered a period during which Defendant Redfearn was part of Aurora Police Department leadership.

25.    On September 15, 2021, the Colorado Attorney General's office published an investigative report ("AG Report"). The executive summary of the AG Report indicated: "Specifically, we find that Aurora Police has a pattern and practice of racially biased policing, using excessive force, and failing to record required information when it interacts with the community."

26.     The AG Report further indicated: "Aurora Police engages in racially biased policing, treating people of color (and Black people in particular) differently from their white counterparts."

27.     The AG Report stated: "In short, Aurora Police has failed to create and oversee appropriate expectations of responsible behavior."

28.     Defendant Redfearn's acts and conduct as a part of leadership in the Aurora Police Department was not just limited to the McClain murder or to the pattern and practice finding in the AG Report. Defendant Redfearn also was named as a defendant in a civil rights case alleging that he was an active participant in violating the constitutional rights of peaceful and lawful protestors following Mr. McClain's murder.

29.     In Case Number 1:20-cv-02172-RMR-MEH filed in the United States District Court for the District of Colorado, Defendant Redfearn was a named defendant for violating plaintiffs' freedom of speech, freedom of assembly, retaliation for the exercise of freedom of speech, excessive force, among other claims.

30.     The acts and conduct alleged in this case involved a peaceful and lawful assembly of individuals on June 27, 2020, in honor of Mr. McClain and a call for justice for his murder. As indicated in the complaint, "Prior to the vigil, community leaders, including one of the named Plaintiffs, secured permission from the City of Aurora to hold a peaceful night of remembrance on the Aurora Municipal Center Great Lawn. Violinists flew in from across the country to participate in this peaceful celebration of life of a young man so full of love and empathy that he played violin to calm frightened and caged animals."

31.     Specifically, it was alleged that Defendant Redfearn "oversaw and directed Defendants who pushed Plaintiffs off the Great Lawn. Defendant Redfearn used and ordered the use of force to do so. Defendant Redfearn made the announcement that the peaceful gathering was a so-called "'unlawful assembly' despite knowing there was no valid legal basis to do so, without adequate time for Plaintiff Class Members to comply, and without leaving room for safe egress."

32.     Members of Aurora City Council also were present at the peaceful and lawful protest.

33.     It was further alleged that Defendant Redfearn, "ordered a group of Defendants to throw smoke cannisters (sic) and other chemical agents indiscriminately into the crowd and did nothing to stop those under this command from using force. Defendant Redfearn also used force himself including deploying a pepper foam fogger at Plaintiff Class Members. He took these actions despite knowing that Plaintiff Class Members posed no threat, had committed no crime, were not inciting imminent lawless action, were not fleeing, and were engaged in peaceful, lawful protest at a public forum."

34.     Just as the McClain civil case, which settled for $15 million, this case resulted in a settlement of $750,000 paid by the City of Aurora to Plaintiffs.

35.     The City of Aurora further entered into a Consent Decree with the Colorado Attorney General's office involving the findings contained in the AG Report.

**Defendant Redfearn's Employment with Defendant Boulder**

36.     Despite Defendant Redfearn's admitted acts and conduct on the night Mr. McClain was murdered, despite being a part of Aurora Police Department leadership that was found to have engaged in a pattern and practice of biased policing (particularly against Black community members) and excessive force, and despite Defendant Redfearn's alleged unconstitutional acts

and conduct involving the peaceful assembly, Defendant Boulder hired Defendant Redfearn as Deputy Police Chief on September 20, 2021.

37.     Records received from Defendant Boulder pursuant to an open records request support that Defendant Boulder has not provided Defendant Redfearn any training on the constitutional rights of individuals, in particular the constitutional right to freedom of speech and to be free from retaliation for the exercise of free speech. Or, if he has been provided training, that the training is so inadequate as to not warrant mention in his training log.

38.     His training log demonstrates, however, that Defendant Boulder transferred over 21 hours of training from the Aurora Police Department – a law enforcement agency found to engage in a pattern and practice of biased policing and excessive force.

**Public Concerns About Defendant Redfearn**

39.     Given Defendant Redfearn's concerning background, Plaintiff and members of the Boulder community, particularly members of the NAACP Boulder Chapter, publicly expressed their objection to Defendant Redfearn's employment with the Boulder Police Department.

40.     Public concerns about Defendant Redfearn's employment were expressed in opinion editorials and posts on social media through the NAACP Boulder Chapter Facebook page.

41.     In his capacity as a private citizen and a member of the NAACP, Plaintiff was instrumental in writing opinion editorials and social media posts to call the public's attention to Defendant Redfearn's employment as a law enforcement officer during his time with the Aurora Police Department and with the Boulder Police Department.

42.     Plaintiff submitted petitions to the Boulder City Council and the Boulder City Manager expressing displeasure with Defendant Redfearn's hire.

43.    Plaintiff is aware that Defendant Redfearn is a public official by virtue of his employment with the City of Boulder and his position as the Chief of Police.

44.    As a public official, Plaintiff believed that Defendant Redfearn was not immune to or insulated from public scrutiny.

45.    One such document calling into question Defendant Redfearn's employment with Defendant Boulder was drafted by Plaintiff entitled "From Lolotai to Redfearn Boulder Keeps Hiring the Worst of the Worst."

46.    Plaintiff submitted this document to the Defendant Rivera-Vandermyde and City Council. The document noted Defendant Redfearn's concerning past work history with the Aurora Police Department, noted Defendant Redfearn's admitted change to the call logs involving the Elijah McClain murder, and noted Defendant Boulder's decision to not publish Defendant Redfearn's work history on its web page despite the fact that other top leaders' work histories are reflected on the web page.

47.    What was particularly concerning for Plaintiff was the history of policing in the City of Boulder. Plaintiff was aware of data from the Bureau of Justice Statistics which showed that the City of Boulder was far above the national and state averages for racial disparities in incarceration of people of color.

48.    Plaintiff, as a private citizen and member of the NAACP, had every right to be concerned about Defendant Redfearn's employment with Defendant Boulder, and to publicly express his concern.

49.    Other private individuals also expressed concern about Defendant Redfearn's position with the Boulder Police Department.

50.     For example, on September 27, 2023, Martha Wilson sent an email to Defendant Rivera-Vandermyde expressing concern about Defendant Redfearn's presence in the Boulder Police Department, particularly after his admission about changing the call logs. Ms. Wilson stated the following:

> *Today he testified and that he took this action without doing any investigation, reviewing body camera footage, and claimed the standard operating procedure BS. This is not going to go over well with anyone. The news is out there and it is only a matter of time before everyone connects the dots.*
>
> ***It appears we have a bad apple in Boulder***. (Emphasis added).

51.     On October 4, 2023, Defendant Rivera-Vandermyde responded, and admitted the following:

> *... While I support Steve, I realize the technical explanations don't allay concerns that stem from deep historic mistrust in policing. Distrust, I'll say, that had deep roots in history based on continuous violent and racists act we continue to see in national policing every day – something I know is more than obvious to you... I know this comes at a moment of deep distrust between police and with community and I hate that this is only deepening that mistrust. I recognize this issue is bigger than whether or not this is standard practice because the larger issue is there are systemic issues in so many public policies and procedures, not ust [sic] policing, that when we see we need to really be brave enough to address them in ways that better enhance transparency and bridge trust with community. When we know better, we do better, and this is an opportunity to look at what we do and call the question on how do we do better.*

52.     Defendant Rivera-Vandermyde forwarded Ms. Wilson's email to Defendant Redfearn. Defendant Redfearn responded to the Wilson email without addressing any of Ms. Wilson's concerns.

53.     On October 5, 2023, Defendant Redfearn sent an email to Mardi Moore, Executive Director of Out Boulder County, asking for a meeting. In his email he stated, "So much

misrepresentation and I want to chat." Defendant Redfearn did not identify what he believed was being misrepresented.

54.     Defendant Redfearn has continuously leaned on the argument that Plaintiff and others were "misrepresenting" facts, but his testimony during the criminal trial is on the record, and the AG Report and Aurora Report are public records.

**Community Outrage to Defendant Redfearn's Application for Chief of Police**

55.     On January 22, 2024, then-Boulder Chief of Police Maris Herold stepped down from her post to take a position with a federal program.

56.     Defendant Redfearn became the Interim Police Chief, effective January 22, 2024.

57.     The vacant Police Chief position was then open for applications.

58.     Defendant Redfearn applied for the position.

59.     Community members, along with Plaintiff, were outraged that Defendant Redfearn would even be considered for the Chief of Police position.

60.     On July 23, 2024, a community meeting was held to discuss Defendant Redfearn's application for Boulder Police Chief.

61.     The meeting was organized to discuss the hiring of a new police chief, and Defendant Redfearn's past conduct with the Aurora Police Department, which included the non-lethal shooting of a Black male suspect, his role in the McClain matter, and his conduct during the peaceful, lawful protest.

62.     As a result of the public criticisms, Defendant Redfearn, Defendant Boulder, Defendant Rivera-Vandermyde, Plaintiff, and members of the NAACP Boulder Chapter agreed to meet to discuss community concerns.

63.     Prior to the meeting, which would be mediated by outside individuals, an agreement was submitted to the parties to establish an understanding of the parameters of the meeting.

64.     The agreement contained a confidentiality clause, which was expressly objected to by Plaintiff and other members of the NAACP Boulder Chapter.

65.     Email communications demonstrate that the mediators and the parties were aware that Plaintiff and other members of the NAACP Boulder Chapter disagreed with the confidentiality clause.

66.     Plaintiff and other members of the NAACP Boulder Chapter refused to sign the agreement as it was drafted. Instead, they added language to the agreement to ensure that they would not be legally obligated by the agreement. The amended agreement now specifically stated:

> *This Agreement confers no legal liability upon the Parties and is intended by the Parties to be followed in good faith.*

**The July 25, 2024 Meeting**

67.     On July 25, 2024, the participants met.

68.     What Plaintiff did not know at the time of the meeting was that another participant was recording the meeting.

69.     What was clearly stated during the meeting were objections to Defendants "coalescing to shut" the NAACP down. One participant found it disrespectful that Defendants wanted to collaborate with the NAACP, but they could not tell the truth, and they engaged in a campaign to isolate the NAACP.

70.    Plaintiff relayed a situation where he called the Boulder Police Department to assist with a hostile individual. He was advised that officers would not help him because he has filmed Boulder police officers.

71.    Participants referenced a letter Defendant Redfearn wrote to the state NAACP to complain about members of the NAACP Boulder Chapter, including Plaintiff, regarding a conversation they had during a Boulder City Council meeting that was overheard by Boulder police officers. Defendant Redfearn was not present during the conversation.

72.    The next day, Boulder police officers told Defendant Redfearn they were offended by the conversation. Defendant Redfearn did no investigation into the conversation, but took the police officers' statement as true and wrote the letter to the state NAACP to complain about the NAACP Boulder Chapter members.

73.    Defendant Redfearn admitted to sending the letter without first speaking to members of the NAACP Boulder Chapter.

74.    The participants stated that it appeared Defendant Redfearn's letter was meant to discredit the NAACP Boulder Chapter members.

75.    Plaintiff and other participants noted that in the 22 years working with the Aurora Police Department, Defendant Redfearn did not speak out against the pattern and practices of unconstitutional behavior of the Aurora Police Department.

76.    During the meeting, Defendant Redfearn complained that one of the Black female participants was smirking. His complaint was met with sharp criticism that he was trying to tone police the participants.

77.    Ironically, Defendant Redfearn then admitted that law enforcement has not treated members of the Black community properly.

78.    In response to the criticism received by Defendant Redfearn from Boulder Chapter NAACP participants, One Boulder Police Department participant made the following observation:

> As someone who may feel like [Redfearn's] under fire unfairly, maybe [Redfearn's] not reacting at his best… that's my observation.

79.    As the meeting ended, Defendant Redfearn indicated that he was not leaving with any animosity.

80.    In full transparency, Plaintiff advised Defendant Redfearn that he would still post his opinion that Defendant Redfearn should not be the Chief of Police.

**Post Meeting – Defendants Attack Plaintiff**

81.    At some point after the meeting, Defendants Redfearn and Rivera-Vandermyde became aware of the recording.

82.    Without any evidence, Defendants Redfearn claimed that Plaintiff recorded the meeting.

83.    They then began a joint campaign against the Boulder Chapter of the NAACP, and Plaintiff specifically.

84.    Defendant Rivera-Vandermyde admitted to the press that she filed a complaint with the national NAACP in early September 2024.

85.    As part of their public statements, Defendant Rivera-Vandermyde and Defendant Redfearn concocted a narrative that Plaintiff made offensive statements about Defendant Redfearn's sexual orientation during the July 25, 2024 meeting. However, the audio recording indicates the opposite.

86.    In fact, the audio recording clearly demonstrates Plaintiff's history of defending non-heterosexual individuals.

87.    Despite this audio evidence, Defendant Rivera-Vandermyde and Defendant Redfearn continued to spread this false narrative about Plaintiff in retaliation for Plaintiff's publicly stated concerns about Defendant Redfearn.

88.    Defendant Rivera-Vandermyde and Defendant Redfearn further spread lies about the July 25, 2024 agreement. They claimed there was a "confidentiality" agreement despite knowing that the language of the agreement changed to remove any legal obligations related to confidentiality.

89.    Defendant Rivera-Vandermyde further issued a public statement on Defendant Boulder's website issuing unsupported accusations against NAACP members who attended the July 25, 2025 meeting, which included Plaintiff.[1]

90.    Defendant Rivera-Vandermyde alleged that NAACP members acted unethically, engaged in "underhanded conduct," and claimed a violation of the confidentiality agreement.

91.    Defendant Rivera-Vandermyde failed to convey to the public that there was no agreement to confidentiality or the provision where the parties would not have any legal obligation to the agreement.

92.    Defendant Rivera-Vandermyde continued with the false accusation and mischaracterization concerning Plaintiff's statements related to non-heterosexual behavior.

93.    Defendant Rivera-Vandermyde publicly expressed her desire that "the national NAACP organization, which has fought tirelessly and admirably for racial justice for years, addresses this unethical conduct by a chapter bearing its name."

---

[1] City Manager Responds to Boulder County NAACP | City of Boulder.

94.     As a result of Defendant Rivera-Vandermyde's letter to the national NAACP, Plaintiff's NAACP membership was suspended.

95.     Defendant Redfearn took his retaliatory conduct even further.

96.     On or about October 16, 2024, Defendant Redfearn filed a complaint with Colorado Attorney Regulation Counsel ("OARC") against Plaintiff. Defendant Redfearn filed the complaint under his official capacity as the Chief of Police of the Boulder Police Department.

97.     In fact, Defendant Redfearn detailed in his complaint the following:

> *I am currently the Chief of Police in the City of Boulder and the unethical actions I am reporting here related to Darren O'Connor... Mr. O'Connor, along with 2 other individuals, attempted to prevent my appointment to the position I now hold by spreading false information about me, and by threatening to disclosure a recording of a confidential mediation if I was appointed.*
>
> *Since October of 2023, three individuals associated with the Boulder County branch of the NAACP have been on a campaign to discredit me, tarnish my reputation, repeatedly make false statements, and prevent me from becoming the Chief of Police. Darren O'Connor is one of those individuals.*

98.     Through this OARC complaint, it was learned for the first time that Defendant Redfearn previously filed an OARC complaint on October 8, 2023 against Plaintiff, which was around the time Plaintiff began publicly expressing concerns about Defendant Redfearn's conduct while employed with the Aurora Police Department.

99.     Defendant Redfearn filed the complaint because of Plaintiff's "aggressive campaign against me to prohibit me from becoming Chief of Police…"

100.    In his recent OARC complaint, Defendant Redfearn accused Plaintiff of violating Rule 8.4 of the Colorado Rules of Professional Conduct. Specifically, Defendant Redfearn alleged Plaintiff engaged in "conduct involving dishonesty, fraud, deceit, or misrepresentation."

101.    His complaint centered on the mediation agreement and the confidentiality clause, which he claimed was violated by Plaintiff.

102.    Defendant Redfearn also claimed Plaintiff engaged in: 1) Breach of Contract, 2) Fraud, 3) Invasion of Privacy and Outrageous Conduct, and 4) Civil Conspiracy to Commit Fraud.

103.    OARC sent the complaint to Plaintiff and sought his response to a series of questions.

104.    On January 9, 2025, Plaintiff responded to Defendant Redfearn's OARC complaint.

105.    In his response, Plaintiff noted that Defendant Redfearn, as a public official, was seeking "to suppress the freedom of speech of his detractors, as well as to seek to punish someone for sharing their perceptions of his shortcomings in his role as chief of police of Boulder."

106.    On February 13, 2025, OARC issued its decision and found that Plaintiff had not violated the Colorado Professional Rules of Conduct, and OARC closed the case.

107.    Despite the OARC being closed, Plaintiff learned on April 25, 2025, Defendant Redfearn is still submitting information to OARC against Plaintiff.

108.    Plaintiff also learned that Defendant Rivera-Vandermyde and Defendant Redfearn also reached out to the Boulder County District Attorney's office to file criminal charges against Plaintiff for "blackmail" or "fraud.

109.    Plaintiff learned that the Boulder County District Attorney's office declined filing criminal charges against him.

## **FIRST CLAIM OF RELIEF**
(Retaliation for Exercise of Freedom of Speech – Defendant Redfearn – Colo. Rev. Stat. § 13-21-131 – Violation of Colo. Const. art. II, Sec. 10)

110.    Plaintiff incorporates each allegation of the preceding paragraphs as though fully set forth herein.

111.    The Colorado Constitution expressly affords every person the right to freedom of speech.

112.    Plaintiff engaged in constitutionally protected activity when he issued public statements objecting to Defendant Redfearn's employment with the Boulder Police Department and his selection as chief of police.

113.    Based on Defendant Redfearn's past acts and conduct with the Aurora Police Department, and the findings against the Aurora Police Department during the time of Defendant Redfearn's employment, Plaintiff raised matters of public concern regarding Defendant Redfearn's hire, and his application for and selection as the chief of police.

114.    Defendant Redfearn is a public official and is not immune to public scrutiny.

115.    Defendant Redfearn then retaliated against Plaintiff by spreading lies and misinformation about Plaintiff through the press, he targeted Plaintiff's membership with the NAACP, he filed complaints with OARC in an attempt to have Plaintiff disciplined, and he contacted the Boulder County District Attorney's office to have criminal charges filed against Plaintiff.

116.    Defendant Redfearn's acts and conduct to retaliate against Plaintiff's freedom of speech caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in his protected activity.

117.    Defendant Redfearn's own statements to OARC, to the NAACP, and the Boulder County District Attorney's office demonstrate his actions were substantially motivated as a response to Plaintiff's protected conduct, which was in protestation to Defendant Redfearn's employment and position with the Boulder Police Department.

118.    Defendant Redfearn was acting in his capacity as a peace officer and acting under the color of law when he retaliated against Plaintiff. All of his complaints focused on his employment with and his position as Chief of Police for the Boulder Police Department.

119.    The acts and omissions of Defendant Redfearn were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's protected rights under the Colorado Constitution.

120.    As a direct result of Defendant Redfearn's unlawful actions as described above, Plaintiff suffered actual, physical, emotional, and mental injuries in an amount to be proven at trial.

## SECOND CLAIM OF RELIEF
(Retaliation for Right to Association – Defendant Redfearn – Colo. Rev. Stat. § 13-21-131 – Violation of Colo. Const. art. II, Sec. 10 and Sec. 24)

121.    Plaintiff incorporates each allegation of the preceding paragraphs as though fully set forth herein.

122.    The Colorado Constitution protects an individual's right to associate with others.

123.    Plaintiff was a member of the NAACP Boulder Chapter at the time he began publicly speaking against Defendant Redfearn's employment with Defendant Boulder and Defendant Redfearn's selection as Chief of Police.

124.    Plaintiff had a right to associate with the NAACP Boulder Chapter in pursuit of political, social, economic, educational and cultural ends. To this end, the NAACP Boulder Chapter and Plaintiff engaged in an expression of public concern regarding Defendant Redfearn's acts and conduct while employed with the City of Aurora, his employment with Defendant Boulder, and his selection as Chief of Police.

125.    Defendant Redfearn is a public official and is not immune to public scrutiny.

126.    Defendant Redfearn, acting under the color of law as Chief of Police and an employee of Defendant Boulder, violated Plaintiff's association by filing complaints against Plaintiff with the state NAACP in order to penalize Plaintiff for his association with the NAACP Boulder Chapter, and to interfere with the internal organization or affairs of the NAACP.

127.    Defendant Redfearn's complaint was a proximate cause of Plaintiff's membership with the NAACP being revoked.

128.    Defendant Redfearn's acts and conduct caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in association with the NAACP.

129.    Defendant Redfearn's retaliation was substantially motivated as a response to Plaintiff's exercise of constitutionally protected conduct.

130.    The acts and omissions of Defendant Redfearn were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's protected rights under the Colorado Constitution.

131.    As a direct result of Defendant Redfearn's unlawful actions as described above, Plaintiff suffered actual, physical, emotional, and mental injuries in an amount to be proven at trial.

### THIRD CLAIM OF RELIEF
(Civil Conspiracy – Defendant Redfearn – Colo. Rev. Stat. § 13-21-131 – Violation of Colo. Const. art. II, Sec. 10 and art. II, Sec. 24)

132.    Plaintiff incorporates each allegation of the preceding paragraphs as though fully set forth herein.

133.    The Colorado Constitution prohibits government retaliation against a person for engaging in their freedom of speech, and freedom of association.

134.    Defendant Redfearn was a peace officer acting under the color of law when he conspired with Defendant Rivera-Vandermyde's to engage in a campaign to attack Plaintiff for the exercise of his freedom of speech and freedom of association when he objected to Defendant Redfearn's employment with the Boulder Police Department and his selection as the Chief of Police.

135.    Defendants sent letters to the NAACP to discredit Plaintiff for expressing his objection to Defendant Redfearn's employment with the Boulder Police Department.

136.    Defendants spread lies and misinformation about Plaintiff in the press.

137.    Defendant Redfearn filed complaints with the Colorado Office of Attorney Regulation Counsel to investigate Plaintiff by accusing him of violating the Colorado Professional Rules of Conduct based on Plaintiff's exercise of his freedom of speech wherein Plaintiff expressed his objection to Defendant Redfearn's employment with the Boulder Police Department and selection as the Chief of Police.

138.    Both Defendants contacted the Boulder County District Attorney's Office in an attempt to file criminal charges against Plaintiff.

139.    Defendant Redfearn's acts and conduct as a peace officer under Colo. Rev. Stat. § 13-21-131 while operating under the color of law to conspire against Plaintiff for his exercise of freedom of speech and freedom of association is an unlawful overt act.

140.    The acts and omissions of Defendant Redfearn were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's protected rights under the Colorado Constitution.

141.    As a direct result of Defendant Redfearn's unlawful actions as described above, Plaintiff's NAACP membership was revoked, he was forced into the OARC investigative

process, and he suffered actual, physical, emotional, and mental injuries in an amount to be proven at trial.

## FOURTH CLAIM OF RELIEF
(42 U.S.C. § 1983 – First Amendment Freedom of Speech Retaliation – Defendants Redfearn and Rivera-Vandermyde)

142.     Plaintiff incorporates each allegation of the preceding paragraphs as though fully set forth herein.

143.     The First Amendment of the United States Constitution expressly affords every person the right to freedom of speech.

144.     Plaintiff engaged in constitutionally protected activity when he issued public statements to object to Defendant Redfearn's employment with the Boulder Police Department and his selection as chief of police.

145.     Based on Defendant Redfearn's past acts and conduct with the Aurora Police Department, and the findings against the Aurora Police Department during the time of Defendant Redfearn's employment, Plaintiff raised matters of public concern regarding Defendant Redfearn's hire, and his application for and selection as the chief of police.

146.     Defendant Rivera-Vandermyde, as the City Manager of Defendant Boulder, and Defendant Redfearn, as the Boulder Chief of Police, respectively, and acting under the color of law then retaliated against Plaintiff by spreading lies and misinformation about Plaintiff through the press, they publicly issued a statement replete with misinformation about Plaintiff, they targeted Plaintiff's membership with the NAACP, and they contacted the Boulder County District Attorney's office to have criminal charges filed against Plaintiff.

147.    Defendant Redfearn, in his capacity as the Boulder Chief of Police, engaged in retaliation when he sought punishment against Plaintiff's law license by filing two complaints with the OARC.

148.    Defendants Rivera-Vandermyde's and Redfearn's acts and conduct to retaliate against Plaintiff's freedom of speech caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in his protected activity.

149.    Defendants Rivera-Vandermyde's and Redfearn's own public statements, statements to the press, to the NAACP, and the Boulder County District Attorney's office demonstrate their actions were substantially motivated as a response to Plaintiff's protected conduct, which was in protestation to Defendant Redfearn's employment and position with the Boulder Police Department.

150.    The acts and omissions of Defendants Rivera-Vandermyde and Redfearn were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's protected rights under the United States Constitution.

151.    As a direct result of Defendants Rivera-Vandermyde's and Redfearn's unlawful actions as described above, Plaintiff suffered actual, physical, emotional, and mental injuries in an amount to be proven at trial.

**FIFTH CLAIM OF RELIEF**
(42 U.S.C. § 1983 – First Amendment Right to Association Retaliation – Defendants Rivera-Vandermyde and Redfearn)

152.    Plaintiff incorporates each allegation of the preceding paragraphs as though fully set forth herein.

153.    The First Amendment of the United States Constitution guarantees the right of individuals to freely associate with others.

154.    Plaintiff was a member of the NAACP Boulder Chapter at the time he began publicly speaking against Defendant Redfearn's employment with Defendant Boulder and Defendant Redfearn's selection as Chief of Police.

155.    Plaintiff had a right to associate with the NAACP Boulder Chapter in pursuit of political, social, economic, educational and cultural ends. To this end, the NAACP Boulder Chapter and Plaintiff engaged in an expression of public concern regarding Defendant Redfearn's acts and conduct while employed with the City of Aurora, his employment with Defendant Boulder, and his selection as Chief of Police.

156.    Defendants Rivera-Vandermyde and Redfearn, in their positions as the City Manager for Defendant Boulder, and Boulder Chief of Police, respectively, acting under the color of law violated Plaintiff's association by filing complaints against Plaintiff with the state and national NAACP in order to penalize Plaintiff for his association with the NAACP Boulder Chapter, and to interfere with the internal organization or affairs of the NAACP.

157.    Defendant Rivera-Vandermyde's and Redfearn's complaints were a proximate cause of Plaintiff's membership with the NAACP being revoked.

158.    Defendants Rivera-Vandermyde's and Redfearn's acts and conduct caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in association with the NAACP.

159.    Defendants Rivera-Vandermyde's and Redfearn's retaliation was substantially motivated as a response to Plaintiff's exercise of constitutionally protected conduct.

160.    The acts and omissions of Defendants Rivera-Vandermyde and Redfearn were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's protected rights under the United States Constitution.

161.    The acts and omissions of Defendants Rivera-Vandermyde and Redfearn were motivated by evil motive or intent, or involved reckless or callous indifference to Plaintiff's federally protected rights under the United States Constitution.

162.    As a direct result of Defendants Rivera-Vandermyde's and Redfearn's unlawful actions as described above, Plaintiff suffered actual, physical, emotional, and mental injuries in an amount to be proven at trial.

**SIXTH CLAIM OF RELIEF**
(42 U.S.C. § 1983 – Civil Conspiracy – Defendant Rivera-Vandermyde and Defendant Redfearn)

163.    Plaintiff incorporates each allegation of the preceding paragraphs as though fully set forth herein.

164.    Defendant Rivera-Vandermyde and Defendant Redfearn are considered a "person" as defined in § 1983, and were acting under the color of law as the Boulder City Manager and the Chief of Police, respectively, when they engaged in a conspiracy with one another to deprive Plaintiff of a constitutional or federally protected right – his right to freedom of speech and freedom of association by which he objected to Defendant Redfearn's employment with the Boulder Police Department and his selection as the Chief of Police.

165.    Defendants engaged in one single plan to discredit Plaintiff in retaliation for the exercise of his freedom of speech and freedom of association wherein he objected to Defendant Redfearn's employment with the Boulder Police Department and his selection as the Chief of Police.

166.    Both Defendants sent letters to the NAACP to discredit Plaintiff for expressing his objection to Defendant Redfearn's employment with the Boulder Police Department.

167.    Both Defendants contacted the Boulder County District Attorney's Office in an attempt to file criminal charges against Plaintiff.

168.    The acts and omissions of Defendants were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's protected rights under the United States Constitution.

169.    The acts and omissions of Defendants Rivera-Vandermyde and Redfearn were motivated by evil motive or intent, or involved reckless or callous indifference to Plaintiff's federally protected rights under the United States Constitution.

170.    As a direct result of Defendants Rivera-Vandermyde's and Redfearn's unlawful actions as described above, Plaintiff's NAACP membership was revoked, he was forced into the OARC investigative process, and he suffered actual, physical, emotional, and mental injuries in an amount to be proven at trial.

### SEVENTH CLAIM OF RELIEF
(42 U.S.C. § 1983 – Failure to Train – Defendant Boulder)

171.    Plaintiff incorporates each allegation of the preceding paragraphs as though fully set forth herein.

172.    As the City Manager and the Chief of Police, Defendants Rivera-Vandermyde and Redfearn, respectively, are employees with final policymaking authority.

173.    Both Defendants engaged in public conduct to violate Plaintiff's constitutional right, and publicly violated Plaintiff's constitutional rights without being checked by Boulder City Council.

174.    As decisionmakers, Defendants Rivera-Vandermyde and Redfearn engaged in a year-long pattern of targeting Plaintiff by filing complaints with OARC, NAACP, and the Boulder County District Attorney's Office.

175.    Their public conduct demonstrated an informal custom amounting to a widespread practice that although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.

176.    Further, documents received from Defendant Boulder demonstrates that Defendant Redfearn has not been trained on the constitutional rights of individuals, specifically rights involving freedom of speech and freedom of association.

177.    As Chief of Police, Defendant Redfearn targeted Plaintiff for retaliation when Plaintiff engaged in his right to freedom of speech and freedom of association whereby he objected to Defendant Redfearn's employment with the Boulder Police Department and his selection as Chief of Police.

178.    Defendant Boulder was aware of Defendant Redfearn's targeting of Plaintiff via emails exchanged with Boulder City Council.

179.    Defendant Boulder's inadequate training amounts to a deliberate indifference to Plaintiff's constitutional rights, that the policymakers of Defendant Boulder can reasonably be said to have been deliberately indifferent to the need.

180.    Defendant Boulder's policy and practice of failing to train Defendant Redfearn resulted in a violation of Plaintiff's constitutional rights.

181.    The need for more or different training was so obvious, and the inadequacy so likely to result in the violation of Plaintiff's constitutional rights, that policymakers of the city, such as Defendant Rivera-Vandermyde and Boulder City Council can reasonably be said to have been deliberately indifferent to the need.

182.    The constitutional violations against and harming Plaintiff were a foreseeable consequence of Defendant Boulder's actions and inactions.

183.    Defendant Boulder's policies, customs, or practices in failing to properly train are a driving force behind the constitutional violations described herein.

184.    Defendant Boulder's inaction in light of its own recognition of the rights secured under the United States is a policy or custom that amounts to the deliberate indifference to the rights of persons, and is the functional equivalent of a decision by Defendant Boulder itself to violate constitutional rights.

185.    The acts or omissions of Defendant Boulder's, including, the unconstitutional policy, procedure, custom, and/or practice described herein, are the legal and proximate cause of Plaintiff's damages.

186.    The acts or omissions of Defendant Boulder as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitutions of the United States and the state of Colorado and caused him other damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against each Defendant, and award Plaintiff all the relief allowed by law, including but not limited to the following:

1) All appropriate relief at law and equity;

2) Declaratory relief and other equitable relief;

3) Actual damages to be determined at trial;

4) Compensatory and consequential damage, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

5) Punitive damages under 42 U.S.C. § 1983 against Defendants Rivera-Vandermyde and Redfearn.

6) Attorney's fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

7) Pre- and post-judgment interest at the appropriate lawful rate; and

8) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 5th day of May, 2025.

/s/ Joseph A. Salazar
Joseph A. Salazar, #35196

Salazar Law, LLC
PO Box 370
Eastlake, CO 80614-0370
Phone: (303) 895-7044
Email: jas@salazarlaw.net

Attorney for Plaintiff Darren O'Connor

<u>**CERTIFICATE OF SERVICE**</u>

On this 5th day of May, 2025, the foregoing **FIRST AMENDED COMPLAINT** was filed using the CM/ECF system. Notice and service also was provided to the following via electronic mail:

Boulder City Attorney's Office
Luis Toro, Esq.
Senior Counsel
1777 Broadway, 2nd Floor
Boulder, CO 80302
Telephone (303) 441-3093
torol@bouldercolorado.gov

Counsel for Defendants


*/s/Joseph A. Salazar*_____
Joseph A. Salazar